UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| ERIK SALAIZ, | § § § | |
| Plaintiff, | § § | |
| v. | § | |
| LENDING 3, INC. a California Corporation | § § § | EP23CV0048 |
| | § § | |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1. The Plaintiff is ERIK SALAIZ ("Plaintiff") a natural person, resident of the Western District of Texas, and was present in Texas for all calls, in this case in El Paso County, Texas.

2. Defendant LENDING 3, INC. ("L3") is a corporation organized and existing under the laws of California and can be served via registered agent Andrea Park at 17220 Newhope Street, Suite 213, Fountain Valley, California 92708.

### JURISDICTION AND VENUE

3. Jurisdiction. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 302.101 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case.

1

4. Personal Jurisdiction. This Court has general personal jurisdiction over the Defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

5. Venue. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District. Residing in the Western District of Texas when he received a substantial if not every single call from the Defendant that are the subject matter of this lawsuit.

6. This Court has venue over the Defendant because the calls at issue were sent by or on behalf of the above-named Defendant to the Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227

7. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

8. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

9. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express

2

consent of the called party unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

10. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

11. Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

12. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

13. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

14. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

15. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

3

unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

16. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

17. The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

18. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

19. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g., Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

4

20. Plaintiff successfully registered his personal cell phone number (XXX) XXX-0898 on the National Do-Not-Call Registry since August 19, 2021, which was more than 31 days prior to receiving the alleged calls.

21. Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

22. Defendant L3 is owned and operated by Andrea Park.

23. Defendant L3 offers mortgage loan services to consumers as listed on their website they own and control https://www.lending3.com. *See Exhibit A*.

24. Defendant L3 hires and authorizes telemarketers to make unauthorized phone calls to thousands of consumers *en masse* using an automatic telephone dialing system ("ATDS") to solicit mortgage loan services on behalf of Defendant L3.

25. Defendant L3 approves of the contracts with their telemarketers.

26. Defendant L3 pays their telemarketers out of bank accounts they own and control.

27. Defendant L3 is well aware that the unauthorized phone calls being made on their behalf soliciting their mortgage loan services violate the TCPA.

28. Plaintiff received at least twenty (20) unauthorized phone calls to his personal cell phone 0898 within a twelve-month period from telemarketers/representatives soliciting mortgage loan services on behalf of Defendant L3 ("the calls").

29. The calls were made using an ATDS that has the capacity to store and produce telephone numbers to be called, using a random or sequential number generator and to dial such numbers.

30. With information and belief Plaintiff received more calls from and/or on behalf of Defendant L3 within the past two years that are unknown to Plaintiff at this time but will be revealed during discovery.

31. On June 13, 2022, Plaintiff received a call to his personal cell phone 0898 from Defendant L3 from phone number 830-637-2162

32. Plaintiff answered and there was 3-4 seconds of dead air followed by an audible beep (indicating the call was made using an ATDS) before connecting Plaintiff to a male telemarketer named Jason calling on behalf of Defendant L3.

33. Jason then asked Plaintiff qualifying questions about his mortgage interest rate, mortgage balance, monthly mortgage payment, mortgage value and credit score.

34. Jason advised Plaintiff he will be transferring him to a loan officer and the call dropped.

35. Jason called again then asked Plaintiff qualifying questions about his mortgage interest rate, mortgage balance, monthly mortgage payment, mortgage value and credit score.

36. Jason transferred Plaintiff to a "loan officer" who identified himself as "Michael Quinteros" from Defendant L3.

37. Jason stated to Michael before transferring,

"Hi Michael, this is Jason I have Erik with me he's paying a 5 percent interest rate conventional loan uh mortgage balance is one sixty and he rates his credit score at like seven hundred and he also looking for fifty thousand dollars cash out and his property value four hundred and the number 915-490-0898 can you proceed the call from here?"

38. Michael accepted the transfer from Jason which confirmed Defendant L3 hires and authorizes telemarketers as part of their marketing to call thousands of consumers soliciting Defendant L3's mortgage loan services.

39. Michael stated to Plaintiff,

"Our call center is calling everybody in your area uh we have a promotion we're offering one or two months of no mortgage payment and also uh getting you a cash out of hundred thousand."

40. Michael verified Plaintiff's income, personal information, and mortgage balance and solicited Plaintiff for a mortgage refinance and cash out on behalf of Defendant L3.

41. Plaintiff received an email from Michael from mquinteros@lending3.com. *See Exhibit B.*

42. The email Plaintiff received from Michael confirmed the company responsible for the calls.

43. Plaintiff advised Michael he would call him back if interested.

44. On the same day June 13, 2022, Plaintiff received another call from a telemarketer named John soliciting mortgage refinancing and cash out services on behalf of Defendant L3.

45. Plaintiff advised John he already advised Michael he would call back if interested.

46. Plaintiff was then bombarded and harassed by telemarketers calling his personal cell phone 0898 soliciting mortgage refinance and cash out option services on behalf of Defendant L3 over the course of the next few months.

47. On July 6, 2022, Plaintiff received a phone call from (760)-974-7540. Plaintiff answered the phone and was met by a male telemarketer named Sam calling on behalf of Defendant L3.

48. Sam then asked Plaintiff qualifying questions about his mortgage interest rate, mortgage balance, monthly mortgage payment, mortgage value and credit score.

49. Sam transferred Plaintiff to a "Senior supervisor" who identified himself as "Sebastian" who attempted to ask the same information to go through the qualification process.

50. Plaintiff advised Sam and Sebastian that he already advised other reps from Defendant L3 that he would call them back if he was interested.

51. Plaintiff stated to Sam and Sebastian,

"You guys don't have to keep calling"

7

52. On July 19, 2022, at 1:08 PM, Plaintiff received a phone call from (830)-637-2202.

53. Plaintiff answered the phone and was met by a male telemarketer named Eric calling on behalf of Defendant L3 despite Plaintiff's request for them not to keep calling.

54. Eric asked Plaintiff questions about his mortgage balance, monthly payment, home value, credit score, and other information in order to qualify Plaintiff and the call dropped.

55. On July 21, 2022, Plaintiff got another call from a male telemarketer named Christopher from Defendant L3 despite Plaintiff's request for them not to keep calling.

56. Plaintiff has never been a client of Defendant L3 and has never had an established business relationship with Defendant L3.

57. Plaintiff did not give his prior express written consent to receive the calls.

58. Defendant L3 has been sued in the past for violating the TCPA *Reuben Nathan v. Reform Solutions Incorporated, et al*, No. 8:20-cv-01453-DOC-KES (C.D.CA., Aug. 04, 2020) and *Callier v. Texana Bank, NA Corporation et al*, No. 3:22-cv-00028-KC (W.D.TX, Jan. 18, 2022) and continue their illegal behavior because violating the TCPA benefits Defendant L3 financially.

59. Defendant L3 has a history of harassing consumers by making unauthorized calls soliciting their mortgage services as per their BBB profile. *See Exhibit C.*

60. Table below displays calls made to Plaintiff from and/or on behalf of Defendant L3.

TABLE A

| Number: | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 1 | 06/13/2022 | 3:22 PM | 830-637-2162 | Male Telemarketer Jason called on behalf of L3 |
| 2 | 06/13/2022 | 3:30 PM | 830-637-2170 | Male Telemarketer Jason transferred to Michael from L3 |

| 3 | 06/13/2022 | 3:47 PM | 830-637-2170 | Male Telemarketer John called on behalf of L3 |
| 4 | 06/22/2022 | 11:12 AM | 325-208-1199 | Telemarketer called on behalf of L3 call dropped |
| 5 | 06/22/2022 | 11:13 AM | 325-216-5761 | Telemarketer called on behalf of L3 call dropped |
| 6 | 07/05/2022 | 12:12 PM | 325-208-1199 | Missed call |
| 7 | 07/06/2022 | 12:50 PM | 830-637-2112 | Male Telemarketer Sam and Sabastian on behalf of L3 |
| 8 | 07/18/2022 | 12:55 PM | 325-208-1199 | Missed call |
| 9 | 07/19/2022 | 1:08 PM | 830-637-2202 | Male Telemarketer Eric called on behalf of L3 |
| 10 | 07/21/2022 | 2:45 PM | 915-503-2880 | Missed call |
| 11 | 07/21/2022 | 5:20 PM | 915-503-2880 | Male Telemarketer Christopher called on behalf of L3 |
| 12 | 07/22/2022 | 2:44 PM | 915-503-2880 | Missed call |
| 13 | 08/15/2022 | 2:27 PM | 830-637-2170 | Missed call |
| 14 | 08/17/2022 | 4:25 PM | 989-263-1378 | Telemarketer called on behalf of L3 call dropped |
| 15 | 08/18/2022 | 11:43 AM | 325-208-1199 | Missed call |
| 16 | 08/18/2022 | 2:24 PM | 830-637-2112 | Missed call |
| 17 | 08/18/2022 | 5:13 PM | 830-637-2112 | Missed call |
| 18 | 08/23/2022 | 5:13 PM | 830-637-2112 | Missed call |
| 19 | 09/15/2022 | 10:41 AM | 325-208-1199 | Missed call |
| 20 | 10/07/2022 | 5:43 PM | 760-794-7540 | Telemarketer called on behalf of L3 call dropped |

61. Defendant's telemarketers/representatives initiated numerous unsolicited telephone calls,

9

made unlawful telemarketing sales pitches to Plaintiff regarding mortgage refinancing and cash out options.

62. Defendant employs, contracts, or authorizes telemarketing firms to make phone calls on their behalf. These telemarketers use various spoofed caller IDs and knowingly and willfully ignore Do Not Call lists in the marketing of services on behalf of L3.

63. Defendant L3 and their agents and co-conspirators amassed lists of thousands of potential customers from public records, and data aggregators, and then placed phone calls using an ATDS *en masse* to market their mortgage refinance loans and cash out options on behalf of Defendant L3.

64. Defendant has knowledge of and has adopted and maintained TCPA violations as a sales strategy. Defendant L3 knew full well that Defendant L3 is calling and harassing consumers in an attempt to procure business on behalf of the Defendant L3. Defendant L3 willfully accepts these referrals and compensate their telemarketers for their illegal phone calls.

65. Each and every call was placed while knowingly ignoring the national do-not-call registry. Each and every call was placed without training their telemarketers/employees on the use of an internal do-not-call policy.

66. On information and belief, Defendant L3 did not train its telemarketers who engaged in telemarketing on the existence and use of any do-not-call list.

67. Plaintiff sent an internal DNC Policy request to Defendant L3 to email apark@lending3.com on January 23, 2023, which is an email owned and controlled by Defendant L3's CEO Andrea Park.

68. Despite this email, Defendant L3 failed and/or refused to send Plaintiff a do-not-call policy.

69. Upon information and belief, Defendant L3 did not have a written do-not-call policy while it was sending Plaintiff the calls.

70. Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

71. Plaintiff has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

72. No emergency necessitated the calls.

## VICARIOUS LIABILITY OF DEFENDANT L3

73. Defendant L3 is vicariously liable for the telemarketing calls that generated the lead on their behalf.

74. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

75. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

76. The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

77. The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

78. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

79. The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

80. To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

81. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

82. Defendant L3 is legally responsible for ensuring that the affiliates that make telemarketing calls on their behalf comply with the TCPA when so doing.

83. Defendant L3 knowingly and actively accepted business that originated through illegal telemarketing.

84. Defendant L3 knew (or reasonably should have known) that Defendant L3's telemarketers were violating the TCPA on their behalf but failed to take effective steps within their power to force them to cease that conduct.

85. By hiring a company to make calls on its behalf, Defendant L3 "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

86. Moreover, Defendant L3 maintained interim control over the actions of their telemarketers.

87. For example, Defendant L3 had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketer.

88. Furthermore, Defendant L3 had day-to-day control over the actions of their telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant L3 and the ability to require them to respect the National Do Not Call Registry.

89. Defendant L3 also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

90. Defendant L3 donned its telemarketers with apparent authority to make the calls at issue. Thus, the Defendant L3's telemarketers pitched "mortgage refinance loans and cash out" services in the abstract.

91. Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

92. "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

93. A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

94. Defendant L3's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant L3. Thus, the telemarketers had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

95. Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

96. Defendants L3 is the liable party as the direct beneficiary of the illegal telemarketing calls as they stood to gain Plaintiff as a customer.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES

14

## AS A RESULT OF THE CALLS

95. Defendant's calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

96. Defendant's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

97. Defendant's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

98. Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of his cell phone.

## THE PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

99. The calls were to Plaintiff's cellular phone 0898 which is Plaintiff's personal cell phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## Violations of the Texas Business and Commerce Code 305.053

100. The actions of the Defendant violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violates 47 USC 227(b). The calls by Defendant violated Texas law by placing calls using an ATDS to a cell phone which violates 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

101. The calls by the Defendant violated Texas law by spoofing the caller ID's per 47 USC

227(e) which in turn violates the Texas statute.

## CAUSES OF ACTION:

### COUNT ONE:

### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent

102. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

103. Defendant and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least twenty (20) times by placing non-emergency telemarketing calls to Plaintiff's cellular telephone number using an automatic telephone dialing system without prior express written consent.

104. Plaintiff was statutorily damaged at least twenty (20) times under 47 U.S.C. § 227(b)(3)(B) by the Defendant by the telephone calls described above, in the amount of $500.00 per call.

105. Plaintiff was further statutorily damaged because Defendant willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court triple the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

106. Plaintiff is also entitled to and does seek an injunction prohibiting Defendant and their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing calls

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 C.F.R. § 64.1200(C))

107. Mr. Salaiz realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

108. Defendant called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

109. Plaintiff was statutorily damaged at least twenty (20) times times under 47 U.S.C. § 227(c)(3)(F) by Defendant by the telephone calls described above, in the amount of $500 per call.

110. Plaintiff was further statutorily damaged because Defendant willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

111. Plaintiff is entitled to an award of up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:

### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

112. Mr. Salaiz realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

113. The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

      a.     a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1);[2]

      b.     training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2);[3] and,

      c.     in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

114. Mr. Salaiz is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

115. Mr. Salaiz is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

116. Mr. Salaiz also seeks a permanent injunction prohibiting Defendant and their affiliates and agents from making telemarketing solicitations until and unless they (1) implement a do-not-call list and training thereon and (2) include the name of the individual caller and name in the solicitations.

## COUNT FOUR:

### Violations of The Texas Business and Commerce Code 305.053

117. Mr. Salaiz realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

118. The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

making non-emergency telemarketing calls to Mr. Salaiz's cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. Defendant violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

119. Mr. Salaiz is entitled to an award of at least $500 in damages for each such violation. Texas Business and Commerce Code 305.053(b)

120. Mr. Salaiz is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053(c).**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Erik Salaiz prays for judgment against the Defendant jointly and severally as follows:

A. Leave to amend this Complaint to name additional does as they are identified and to conform to the evidence presented at trial;

B. A declaration that actions complained of herein by Defendant violates the TCPA and Texas state law;

C. An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D. An award of $1500 per call in statutory damages arising from the TCPA §227(b) intentional violations jointly and severally against the corporation for twenty (20) calls.

E. An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporation for twenty (20) calls.

F. An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

G.   An award to Mr. Salaiz of damages, as allowed by law under the TCPA;

H.   An award to Mr. Salaiz of interest, costs, and attorneys' fees, as allowed by law and equity

Such further relief as the Court deems necessary, just, and proper.

February 3, 2023,                Respectfully submitted,

Erik Salaiz
Plaintiff, Pro Se
319 Valley Fair Way
El Paso, Texas 79907
915-490-0898
Salaiz.ep@gmail.com